Good morning. May it please the Court, Norman Sullivan on behalf of Crystal Cruise Lines and the vessel, the Crystal Serenity. In this instance, Emerson and its subsidiaries, Leroy-Somer subsidiaries, sold Crystal and its parent, NYK, a bill of goods that they could manufacture a satisfactory 11,000-volt generator to operate the Crystal Serenity. Crystal relied upon this when it approved Moteurs Leroy-Somer's selection to be the generator vendor. The generators began experiencing discharging, arcing, and one failed in 2009. This necessitated all six of the generators to be rewound at a cost of $7 million. I think the issue, counsel, is whether you have jurisdiction. Isn't that the issue here? Yes, it is, Your Honor. You may want to get to that. All right. I think we know what the damages are, and I think it's a question of whether you've got the right parties in court. Yes, sir. We believe we do have the right parties in court. We believe that there is general jurisdiction in this case because of the basically the actions of Moteurs Leroy-Somer in injecting itself into California. As early as 1983, they purchased a California company. Which they sold over 20 years ago. That's right. They sold that over 20 years ago. How is that general jurisdiction today? Well, because they demonstrated a need and a want and an urging to come into California. Emerson purchased them in 19 — purchased Moteurs Leroy-Somer in 1990. It didn't need that distribution system anymore, so it formed its own subsidiaries, Leroy-Somer North America and Leroy-Somer Power and Drives, to market Moteurs Leroy-Somer's activities in California. The Supreme Court's case, Goodyear, kind of gives a stamp of approval on corporate organizations that have lots of different entities operating in lots of different countries. How is this not governed by Goodyear? I think it's different from Goodyear. Goodyear is obviously a difficult point for us, but I think it's different than Goodyear because they came into — Moteurs came into California albeit a long time ago. It, however, also used and took advantage of the court system in California for over 10 years in litigation. It participated in a trade fair in Los Angeles in 1911, where it was propounding its wind energy activities. It's been selling its products through the Emerson subsidiaries in California to the tune of over a billion dollars in the last five or six years. I think those things differentiate it from — Selling through subsidiaries, Goodyear pretty clearly says, that's not the same thing. It's not the same entity. But in this case, we also have — I think Goodyear had an exception of the — or talked about, at least, the single enterprise theory, and we also have the representative services doctrine, which, in this instance, Emerson and the Leroy-Somer entities have all marketed themselves as one single entity, all integrated, not suggested. One does not have responsibility for the others. And I think you can look at those aspects and those theories also, where — Well, Goodyear used the same name every place, which isn't the case here. And that's, by itself, wasn't enough. That's — that's true. But in this case, the — under the representative services doctrine, the fact that it was significantly important to Leroy-Somer that his products be entered into California through the subsidiaries, it did — it did this. It looked — it looked at the activities of the subsidiaries in California selling his products. It was totally necessary for Montour's Leroy-Somer to have those subsidiaries in order to sell its products. The — the — my opponents have said, well, the Montour's Leroy-Somer products into California were a small part of Leroy-Somer's business, only $1 million over a period of a few years. But I think if you look at the — the court's analysis of significant importance in the upon the Second Circuit. And the Second Circuit case that was referred to there dealt with Tanner Motors. And the court, New York court, found jurisdiction over Tanner Motors in California when a large corporation that had buses, taxicabs, that sort of thing, and it had a service — or a tour that its agent, Tanner's agent in New York, was propagating. And it only had about $120,000 worth of business in — through that agency. And the court found that that was sufficient enough to find there was a significant importance in — in finding jurisdiction over — over — over Tanner in California. The — the other point I would like to touch upon is the ostensible — ostensible authority issue. And that, I think, results from the fact that effectively through its marketing and its presentations, Emerson represented itself as standing behind its subsidiaries, such as Montour's Leroy-Somer. The presentation that was given to — by Montour's Leroy-Somer to become the generator vendor didn't even mention — Who made — who made the presentation? The presentation was made by Montour's Leroy-Somer, the manufacturer of the company. The ostensible agent? We believe that it was the ostensible agent of the principal, Emerson, because — These are representations made by Montour, not by Emerson. That's correct. But the presentation that it gave was a presentation that had Montour — that had Emerson's name all over it. Montour's Leroy-Somer was not even mentioned in that presentation. I thought the law — you can correct me if I'm wrong — I thought it has to be representations by the principal that lead one to believe that it has delegated authority or such to its agent. But you're saying the agent is the one that made the representation. You're absolutely right, Your Honor. And the agent was the one that made the presentation. But the presentation was one that had Leroy's — that had Emerson's name all over it. And I think it's reasonable to believe when you look at Emerson's modus operandi, for example, Montour's Leroy-Somer's website, if you go to it, you end up with Emerson's website. I think it's reasonable to believe that Emerson would have had to have known that Montour's Leroy-Somer was using its name and representing that Emerson stood behind it, which was relied upon in this case to have — for Montour to become the generator vendor in the instance. So who relied upon that? The person that relied upon that was N.Y.K., the parent of Crystal, and Crystal, the testimony of Mr. Valenti, who was Crystal's representative at E.R. page 66. I read the Valenti testimony about that. Was that the reliance then by N.Y.K. and the French company C.A.T.? Were they the ones relying on this presentation? The N.Y.K. and Crystal were the ones relying upon it. Montour's was selling to the shipyard. It knew that the shipyard was just the shipyard building the vessel for the Crystal. They owned the vessel for Crystal. It knew that it was it, and so it was the Crystal people and its parent, N.Y.K., who had submitted questions to — had submitted questions to Montour's Leroy-Somer through the shipyard, which they responded to, and so — So what's the evidence that Emerson participated in this presentation? There's no evidence that Emerson directly participated in the presentation. I think the situation is, is that given the contents of the presentation, it's reasonable to assume that Emerson would have known that Montour's Leroy-Somer was using its name to indicate that Emerson was standing behind Montour's Leroy-Somer for the manufacture of these generators. We think — just very briefly to get back on the ostensible authority — we think there's enough information there to allow the court to conclude that there is a triable issue of fact based upon the things that we pointed out in our brief. If not, we know that the court did not allow us to conduct additional discovery, which we requested, and I would just point to record excerpt number 40, which indicates that Emerson was also of the belief that we were only entitled to conduct jurisdictional discovery when it objected there in the response to our request that — it objected to certain requests because they were beyond the scope of the jurisdictional discovery allowed by the court. Thank you, Your Honor. Thank you. We'll hear from defendants. Susan Williams for the Appellees Emerson, Leroy-Somer. Can you pull the mic a little closer because Judge Goodwin and we won't be able to hear you otherwise. You can pull it down. It's movable.  Susan Williams for Appellees Emerson, Leroy-Somer. I would just like to respond to some of the statements made in the preceding argument to correct a few what I believe are misrepresentations of the record. As an initial matter, nothing in the record supports the representation that Emerson sold a bill of goods to Crystal and its parents. The record demonstrates that non-party and non-governmental  N.Y.K. contracted with non-party C.A.T. in France to have built in France a ship. Moteurs was selected to provide the generators for that ship by C.A.T. with input from N.Y.K. So no bill of goods was sold to any plaintiff in this action by any defendant. There was no privity of contract. There were no direct representations. Turning for a moment to the presentation that refers to Emerson and Leroy-Somer working together. As the district court correctly recognized, no evidence was presented either of the motion to dismiss or the summary judgment motion that demonstrated that that presentation was authored by or done at the behest of Emerson. And in fact, it was not given to any plaintiff or appellant in this action by any of the appellees. The testimony from Mr. Valenti was that N.Y.K. was given that presentation by C.A.T. and the appellants here received it only from their parent corporation. So once again, the contacts are so much more attenuated that are being represented here and are attenuated in ways that demonstrate the correctness of the district court's decision, first, to dismiss for lack of jurisdiction the French appellees, and second, to grant summary judgment in favor of Emerson because there was no demonstration that Emerson had anything to do with any of the transactions which are the subject of this case. Now, in the case of the Bowman case, there was no evidence, as the district court correctly recognized, that the services being performed by Emerson in purchasing from Mottur's products, for which the record shows Emerson purchased them at arm's length by making a purchase order, being invoiced, paying for them, having them shipped from France to South Carolina, and then in turn selling them around the United States to various American clients who in turn paid Emerson through its divisions. These were not subsidiaries. They were divisions. That was made clear in the testimony of Emerson's corporate representative, which is also in the record. There was absolutely nothing in that testimony that provided the district court or this court with evidence that Emerson's sales activities of Mottur's products were so important that if Emerson were not available, Mottur's would undertake to replicate those activities itself or find a new representative to do so. Perhaps more importantly, as Bowman states, there must also be a showing that the principal exercised some element of control over the agent. And the record here is devoid of any evidence that Mottur's or its holding company, Leroy Somer, exercised any degree of control over Emerson. And indeed, the district court correctly noted that the undisputed evidence in the record that Emerson's reselling of products of Mottur's was conducted in a way which would undercut even an inference that Emerson controlled the French subsidiary from which it was purchasing products at arm's length for resale domestically. Finally, turning briefly to the question of ostensible authority, there is no evidence that any appellant here relied on Mottur's with an ostensible belief that Mottur's was acting with Emerson's authority. The alleged evidence of that, once again, is a presentation which is not shown to have been generated by Emerson, nor was it provided to Crystal or the appellants by Emerson or even by Mottur's. They received it from their parent corporation, NYK, who received it from non-party CAT, the French shipbuilder. There is no ---- It's not a hard inference that if a subsidiary cranks out a promotional brochure of some kind with the parent's name, the parent's probably not ignorant of it. Now, there's no evidence of Emerson's involvement, but plaintiff has said they didn't have an opportunity to conduct discovery on that question. Which is not correct, of course, because as the district court pointed out, the timeline in this case was that the parties were allowed to commence discovery as soon as the Rule 26F conference had taken place. That conference took place, I believe, in February, which was well prior to the July 1st order, in which the district court allowed them limited jurisdictional discovery against the party's challenging jurisdiction, which would be the two French entities. There was never any restriction on appellants' ability to take discovery from Emerson as to what Emerson did or did not do. And indeed, Emerson would be the logical party from whom to take discovery to determine what Emerson's alleged involvement might have been in the creation of those promotional materials. And they did, in fact, depose Mr. Sadewich, I believe is his name, Emerson's corporate representative. So they had that opportunity. They were in no way restricted from taking that discovery. In sum, one last point. Mr. Valenti, who testified on behalf of appellants, did testify on behalf of appellants, did testify that he never communicated with any defendant until after the ship had launched, which goes to the question of whether there was any kind of reliance shown on the famous presentation by appellants here. There simply was no showing. The presentation was the decision made by NYK was to purchase a ship from CAT. CAT chose to purchase the generators from Moteurs. And there are no, there is simply nothing that ties either of the French corporations to California sufficient for the exercise of personal jurisdiction. And there is no evidence, notwithstanding appellants having had the chance to take and having taken Emerson's deposition, that demonstrates any basis for Emerson having any liability. For the failure of the generators manufactured by Moteurs many, many years before in France. If the court has any other questions for me, I'd be happy to respond. Well, I have one question about the choice of forum contract in the shipbuilding contract between NYK and CAT. There is a choice of forum clause in there. Has anybody relied on that for any, says it will be tried in any dispute arousal, the shipbuilding or outfitting of the ship will be litigated in France under French law. I agree. That same clause, that clause exists in two contracts that are referred to here. One was the contract between NYK and CAT for the construction of the ship, and that has not been heavily emphasized up to this point, although it is in the record. And the same provision that French law would apply and disputes would be arbitrated in France is contained in the terms and conditions pursuant to which Moteurs performed in 2009 some repairs on the ship's generators. So in each case, that would once again militate against any belief that the French companies were attempting to avail themselves of the benefits of California, interjecting themselves into California. But once again, the contract for the building of the ship was between two entities, neither of whom is a party to this action. Thank you. Thank you, Your Honor. Thank you. I think you may have a few seconds left. We'll give you a minute if there's something that you think needs to be said. Just with respect to the last point of the contract between the shipyard and the Moteurs Leroy Summer, Crystal was not a party to that. They were not a privy to that, and the basis of our suit is not based upon that contract. Didn't think so.
judges: Goodwin, Fisher, Clifton